W. E. McLAUGHLIN and MRS. JANE MARIE Mc-
LAUGHLIN, Appellants, v. W. E. SMITH and JERRY
R. HALL, Appellees.—412 S.W.(2d) 21.

Western Section. February 4, 1966.

Certiorari Denied by Supreme Court, September 6, 1966.

716

Grover N. McCormick, Sr., Grover N. McCormick, Jr., Memphis, for appellants.

Robert Drewry, Winchester, Goff, Winchester & Walsh, Memphis, for appellants.

CARNEY, J. ▮ The appellants, Mr. and Mrs. Mc-Laughlin, who are citizens and residents of Horn Lake, Mississippi, recovered a judgment in the General Sessions Court of Shelby County, Tennessee, in the amount of $2,499.99 against the defendants, W. E. Smith and Jerry R. Hall, enforcement agents of the Division of Fish and Game, Department of Conservation of the State of Tennessee. The suit arose out of an alleged unlawful arrest and malicious prosecution of Mrs. McLaughlin on charges of transporting minnows into the state bought from an unapproved hatchery and charges of transporting minnows into the state without a transportation permit. The defendants, Hall and Smith, appealed to the Circuit Court of Shelby County, Tennessee, where a second trial de novo was held before the Circuit Judge without a jury. The Circuit Judge reversed the action of the General Sessions Judge and dismissed the suit of both plaintiffs. From this action Mr. and Mrs. McLaughlin have appealed to this court and assigned errors. The case will be tried in this court de novo upon the evidence heard before the Circuit Judge accompanied by a presumption of correctness of the judgment below. T.C.A. Section 27-303.

Mr. and Mrs. McLaughlin live in Horn Lake, Mississippi, on U. S. Highway 51 about one-half mile south of

the southern border of Shelby County which is also the Tennessee-Mississippi state line. They are former residents of Shelby County, Tennessee. For the past several years they have operated a bait and minnow business in the little community of Horn Lake, Mississippi, located only a short distance south of the Tennessee-Mississippi line. They sell minnows both retail and wholesale; that is, they sell minnows to fishermen in small quantities such as one, two or three dozen and they sell larger quantities such as hundreds or thousands to bait and minnow dealers for resale. For the past several years they have been accustomed to buying their minnows from hatcheries in Lonoke, Arkansas, and DeValls Bluff, Arkansas.

They regularly hauled their minnows by pickup truck with vats containing water. An agitator provided oxygen for the minnows and was run by an electric motor attached to the battery of the pickup truck. The regular route for the transportation of such minnows to Horn Lake, Mississippi, was through Shelby County across the Mississippi River at Memphis directly to DeValls Bluff or Lonoke. Arkansas, and return to Memphis and Horn Lake by U. S. Highway 51. The McLaughlins have no license nor permit to sell or deliver minnows in Memphis, Tennessee. Prior to this case there has never been any question by Tennessee officers as to the right of Mr. and Mrs. McLaughlin to haul their minnows in interstate shipment from the hatchery at DeValls Bluff or Lonoke, Arkansas, through Memphis and Shelby County to Horn Lake, Mississippi.

Conservation officers Smith and Hall, the defendants, were suspicious that Mr. and Mrs. McLaughlin were selling and/or delivering minnows to bait and minnow dealers located in Memphis and Shelby County in violation of

Tennessee law. In an effort to catch them officers Hall and Smith, in plain clothes, and in an unmarked automobile, on May 16, 1963, placed Mr. and Mrs. McLaughlin's minnow business under observation beginning in the early hours of the morning. About 2:00 P.M. that afternoon they saw Mrs. McLaughlin leave her place of business in a pickup truck with vats or tanks for hauling minnows. Mrs. McLaughlin was on her way to DeValls Bluff, Arkansas, to obtain a supply of minnows. She followed her regular route up Highway 51 through Shelby County and Memphis, Tennessee, and across the Mississippi River and into Arkansas. Officers Smith and Hall followed her into Arkansas about a mile and a half beyond the Mississippi River bridge where they stopped their car and awaited her return. Sometime between 7:30 and 8:00 P.M. the same day, May 16, Mrs. McLaughlin returned from DeValls Bluff in the pickup truck with a load of minnows and passed officers Smith and Hall at their lookout point.

Officers Hall and Smith were in communication with Conservation Officer Barnes by radio. Mr. Barnes was in uniform driving a marked car and it was anticipated that Mrs. McLaughlin would stop at one or more minnow dealers in Memphis and Shelby County and make deliveries and/or sales of minnows and that officers Hall and Smith would follow her, spot the illegal deliveries and sale and summon officer Barnes to the scene to complete the arrest. Officers Hall and Smith were unable to follow Mrs. McLaughlin closely through the City of Memphis because of the press of traffic.

Shortly after crossing the Mississippi River into Memphis they lost sight of her pickup truck and did not locate her until she was on Highway 51 south, about one-half

mile from the Tennessee-Mississippi line. They had seen her make no deliveries of any kind. There was no evidence introduced in the trial below that Mrs. McLaughlin had made any deliveries and sales of minnows while passing through Memphis on this trip.

Officers Hall and Smith stopped her truck less than a half mile from the Tennessee-Mississippi line, introduced themselves as conservation officers, asked if Mrs. McLaughlin had a permit to which she said she didn't. Then they asked for a bill of sale which she produced showing approximately $230 worth of minnows from DeValls Bluff bound for Horn Lake, Mississippi. Mr. Hall then checked the minnows and found them to be free from disease. However, he refused to permit Mrs. McLaughlin to drive on to Horn Lake, Mississippi, to unload the minnows stating that he was holding her for transporting minnows into Tennessee from an unapproved hatchery without a permit. Friends of Mrs. McLaughlin passed by and being informed of her trouble immediately notified her husband, Mr. McLaughlin, who came to the scene. Angry words and some profanity ensued between Mr. McLaughlin and the officers over the legality of Mrs. McLaughlin's arrest.

It was then between 8:00 and 8:30 P.M. and officers Smith and Hall insisted that Mrs. McLaughlin must go back to the courthouse in Memphis, Tennessee, to be formally charged and to make an appearance bond of $38. Mrs. McLaughlin was carried to the Shelby County jail accompanied by Mr. McLaughlin and after a wait of some two or three hours was released upon the deposit of $38 cash bond.

Warrants were issued four days later charging her with transporting minnows into Tennessee without a

permit and with transporting minnows into Tennessee from an unapproved hatchery. Upon a trial Mrs. McLaughlin was exonerated of the charges by the Judge of the General Sessions Court. No appeal was taken by the State or the Conservation officers and her exoneration has become final. No criminal charges are now pending against her arising out of the transportation of the minnows from DeValls Bluff to Horn Lake, Mississippi, on the evening of May 16, 1963.

After her exoneration Mr. and Mrs. McLaughlin brought suit for damages against officers Hall and Smith for false arrest and malicious prosecution. In addition to the damages of embarrassment and humiliation and inconvenience to Mrs. McLaughlin, Mr. McLaughlin claimed damages in the amount of $233 for the truckload of minnows which died. Mr. McLaughlin claimed that the officers refused to permit him to take the truck to Mississippi to unload the minnows. He admitted that they did offer to let him drive the truck to the courthouse where Mrs. McLaughlin was to be charged. The officers testified that they told him the truck was completely released and he could have taken it to Mississippi. At any rate Mr. McLaughlin turned off the motor to the pickup truck which in turn shut off the generator on the truck. The agitator was left running off the battery but in the hours which elapsed between Mrs. McLaughlin's arrest and release the battery ran down, the generator quit working and most of the minnows died from lack of oxygen.

Sections of Tennessee Code Annotated applicable to this case are as follows:

"51-214. Bait dealers—License and permit requirements—Reports—Penalty for violation.—All persons selling or furnishing minnows to others, or catching

minnows for others, shall be required to buy a license annually; the price of a resident license shall be ten dollars ($10.00) ; the price of a nonresident license shall be two hundred fifty dollars ($250). The director shall be empowered to issue a helper's license which shall be ten dollars ($10.00) the same as the resident bait dealer's license. A helper is defined as a person who helps or assists in the taking, seining or procuring of minnows for exchange, barter or sale.

Each bait dealer shall make a monthly report to the director of game and fish on forms provided as to the number of minnows sold and shall indicate the source of supply of such minnows, provided the director of game and fish may, in his discretion, require only those monthly reports that he may deem necessary. All persons transporting bait minnows into Tennessee from any other state shall first obtain permission to do so from the director of game and fish. The game and fish commission shall be empowered to inspect any shipment of live minnows and if found diseased may cause same to be destroyed without being liable for damage for such destruction. It shall be unlawful to take, possess or to transport any bait minnows from any of the waters in the state of Tennessee for sale outside of Tennessee, or to sell within the state of Tennessee any live minnows for use in another state, unless such minnows shall have been artificially propagated under permit from the game and fish commission.

Any person, firm or corporation violating the provisions of this section shall be guilty of a misdemeanor and punishable by a fine of not less than twenty-five dollars ($25.00) nor more than fifty dollars ($50.00).

(Acts 1951, ch. 115, sec. 25 (Williams, sec. 5178.54); 1957, ch. 386, sec 1; 1959, ch. 322 sec. 1.)"

"51-436. Taking, transporting and sale of minnows for bait—Regulations—Penalty for violation.—It shall be lawful for any person or persons to capture and retain minnows to be used for bait from the waters of Tennessee, by means of a dip net or minnow net of a mesh size of no greater than three eights (⅜) inch on the square and not more than ten (10) feet in length. Any game fish or fish other than minnows, taken in such net shall be returned to the waters and released immediately, and it is hereby declared unlawful to retain or keep any sunfish, bass, perch, trout, pike or any fish other than minnows taken by such net. Provided further, that the game and fish commission may close by proclamation, as herein provided, certain waters from time to time, against taking of minnows, and may regulate the taking of minnows from public fishing waters when this is found necessary.

The game and fish commission shall be empowered to restrict by proclamation the importation of any species of minnows or other fish into the state.

Any person, firm or corporation furnishing bait minnows to be sold in the state shall apply annually to the game and fish commission and secure a permit. Before such permit is issued it will be necessary for the applicant at the applicant's expense to cause an inspection to be made of the plant and facilities in question by person or persons designated by the game and fish commission at regular state expense schedule for per diem and mileage traveled. Any person, firm or corporation furnishing minnows or bait to be sold in the state shall also be required to furnish such infor-

mation and reports pertaining to the sale of minnows or bait as the game and fish commission may deem necessary. Permits shall be issued in two (2) categories, one (1) for hatcheries and another for those engaged in transporting minnows. An invoice showing both hatchery and transporter permit number shall accompany each and every shipment. All permits will expire June 30 following date of issuance.

The game and fish commission shall be empowered to inspect any shipment of live minnows and if found to be in violation of this section may cause same to be destroyed without being liable for such destruction and the commission shall not be liable for any loss of minnows arising from inspection or checking for compliance of this section.

Any person, firm or corporation violating the provisions of this section shall be guilty of a misdemeanor and be punishable by a fine of not less than twenty-five dollars ($25.00) nor more than fifty dollars ($50.00) and if on second offense and in the discretion of the court, the deprivation or prohibition of the offender from obtaining a transportation permit for a period of twelve (12) months. (Acts 1951, ch. 115, sec. 25 (Williams, sec. 5178.54); 1955, ch. 336, sec. 1; 1957, ch. 94, sec. 1; impl. am. Acts 1957, ch. 323; 1957, ch. 382, sec. 8; 1959, ch. 322, sec. 2.)"

Officers Hall and Smith were the only witnesses for the defense. Each of them testified that they understood the above statutes to mean that they had a right to arrest anyone transporting minnows along the highways of Tennessee without a permit from the State of Tennessee or transporting minnows from an unapproved hatchery regardless of whether the minnows were to be sold or

delivered in the State of Tennessee. They testified that they had made other arrests under similar circumstances. They did not name the persons arrested, nor the date and place of the arrests, nor reveal the outcome of the trials. No attempt was made by the defense to show that the superior officers of the Fish and Game Division encouraged or even condoned the arrest by these officers of persons transporting minnows through Tennessee bound for another state in interstate shipments.

The Trial Judge was of the opinion that the second paragraph of T.C.A. Section 51-214 quoted above was sufficiently ambiguous as to absolve the defendants from liability for false arrest and malicious prosecution in the present case. He cited and relied principally upon the case of Bricker v. Sims, 195 Tenn. 361, 259 S.W.2d 661. In that case our Tennessee Supreme Court, opinion by Chief Justice Neil, held that the officers of the Town of Martin were not liable in damages for unlawful arrest and false imprisonment where they sought to enforce a curfew law or ordinance of the City of Martin prohibiting persons from being on the public sidewalks, etc. after 11:00 P.M. even though the ordinance itself might be unconstitutional.

In our opinion Bricker v. Sims is not applicable to the present case. We think a reasonable construction of T.C.A. Sections 51-214 and 51-436 is that the law is designed to prevent the delivery of minnows within the State of Tennessee from an unapproved hatchery and the prevention of the delivery of minnows within Tennessee by persons without the proper license and permit. It would constitute an unreasonable burden upon interstate commerce to require a citizen of another state to obtain a permit before he could bring minnows from another

state along the highways of Tennessee to his home state where it is not contemplated that the minnows will come to rest within the State of Tennessee so as to constitute a disease hazard to Tennessee minnows or fish.

The preponderance of the evidence convinces us that the defendants, Hall and Smith, were vexed that they lost Mrs. McLaughlin in the traffic in the City of Memphis after having her under surveillance from the wee small hours of the morning of May 16 until about 8:00 P.M. that evening. They probably felt that she had made an illegal delivery of some of the minnows while on her way across Memphis and they had missed their chance to catch her. She was about to get back into the State of Mississippi without arrest and all of their efforts would have been for nought. Under these circumstances these defendants, Hall and Smith, arrested Mrs. McLaughlin, took her to the Shelby County jail and charged her with two offenses. They probably thought that she would forfeit the appearance bond and not resist the charges.

 The gravamen of a suit for false arrest and malicious prosecution is that the prosecutor charged the plaintiff with committing a criminal offense without probable and reasonable cause to believe that the accused was guilty of such offense and out of a sense of malice. Thompson v. Schulz, 34 Tenn.App. 488, 240 S.W.2d 252; Kinnard v. Frierson, 190 Tenn. 304, 229 S.W.2d 348. The malice may be inferred from the want of probable cause. Dunn v. Alabama Oil and Gas Co., 42 Tenn.App. 108, 299 S.W.2d 25; Thompson v. Schulz, supra.

 As we stated above we think it very significant that no superior officer of the Department of Fish and Game of the State of Tennessee appeared as a witness for the defense to establish that it was the policy of the Depart-

ment of Fish and Game to arrest nonresidents of Tennessee for hauling minnows through Tennessee without a permit and for hauling minnows in Tennessee from an unapproved hatchery. We think it very significant that when the General Sessions Judge dismissed the two charges against Mrs. McLaughlin the Department of Fish and Game made no effort to appeal the case to the Circuit Court of Shelby County; nor was any effort made to obtain a construction of the act by any court higher than the General Sessions Court. These facts preponderate in favor of plaintiffs' insistence that the defendants, Hall and Smith, did not arrest and swear out warrants against Mrs. McLaughlin in good faith; and that they realized that the General Sessions Judge was eminently correct in dismissing the warrants when Mrs. McLaughlin and her husband appeared for trial. Warrants were not actually issued until four days after the arrest. Therefore, we hold that His Honor the Trial Judge was in error in reversing the action of the General Sessions Judge and in rendering judgment for the defendants in Circuit Court. Assignment of Error No. I is sustained. The other assignments of error are pretermitted.

■ Turning now to the question of damages we observe first that we do not think either Mr. or Mrs. McLaughlin can recover damages for the value of the minnows which died because we think the minnows died from the unnecessary act of Mr. McLaughlin himself. Admittedly, he was angry and cursing officers for stopping his wife. By his own testimony they offered to permit him to drive Mrs. McLaughlin in the truck to the courthouse. He refused. Instead he took the keys out of the pickup truck and left the truck parked at the scene of the arrest. He knew or should have known that ultimately, without the

motor running, the battery would go down; the electric agitator would stop; and the minnows would die for lack of oxygen. He stated that when he took the keys out of the truck he would be expecting the defendants or someone to pay for the minnows. Mr. McLaughlin could have prevented the death of the minnows simply by driving the truck to the courthouse where Mrs. McLaughlin was to post cash bond and then be released.

 Under all the circumstances we think an award of $500 actual damages to Mrs. McLaughlin and $500 punitive damages making a total judgment of $1,000 against the defendants, Smith and Hall, would meet the ends of justice in this case. Accordingly, the judgment will be entered in said amount in favor of Mrs. McLaughlin and against the defendants together with costs of the cause. The action of the Trial Judge in dismissing Mr. McLaughlin's claim for damages is affirmed.

Avery, P. J. (W.S.), concur in part.

Bejach, J., concur.

Avery, P. J. (W.S.) (concurring in part).

I concur in finding the defendants acted illegally, or not in good faith, but in my opinion the amount of damages, as reduced, are excessive under the facts revealed by the record, and that a total of $500 would be adequate.